UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CVS PHARMACY, INC.,       )<br><br>Plaintiff,       )<br><br>v.       )<br><br>ADAM S. KORN,       )<br><br>Defendant.       ) | Civil Action No. _____ |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff CVS Pharmacy, Inc. ("CVS") files this Complaint against Adam S. Korn ("Korn") and alleges as follows:

## INTRODUCTION

CVS brings this action to halt Defendant Korn's ongoing and brazen effort to trade on confidential information—including attorney-client privileged information—he obtained while employed at CVS in direct violation of his restrictive covenant obligations. From May 8, 2017 until his termination effective February 4, 2023, Korn worked as the Vice President, Client Service Operations at CVS Pharmacy, Inc., a subsidiary of CVS Health Corporation ("CVS Health"). In that role, Korn led the department responsible for handling processing of Medicaid and Government Agency claims—including claims filed by pharmacies operated by Indian tribes as defined by 25 U.S.C. § 1603 (hereafter, "ITU Pharmacies")—for CVS Health's Pharmacy Benefit Management ("PBM") arm, CVS Caremark.

By virtue of his position, Korn was privy to and highly knowledgeable of a voluminous amount of CVS's confidential information. That information includes, *inter alia*: the inner workings of CVS's processes and procedures for adjudicating and reimbursing ITU Pharmacy and other government-entity claims; CVS's contracting, pricing, and business strategies for its

contracts with clients and pharmacies; and CVS's use of claims adjudication pricing logic and software central to Caremark's Medicaid and Government Agency claim reimbursement process. Indeed, Korn's knowledge in these areas is so extensive that when the Chickasaw Nation sued Caremark in 2020 for allegedly improperly denying claims submitted by its pharmacies, Korn immediately became the go-to business-side point of contact for CVS's internal and external lawyers defending Caremark.

Because Korn had access to so much highly confidential, closely-held information—including privileged information—Korn was asked to sign and agreed to a Restrictive Covenant Agreement ("RCA") imposing on him certain non-consultation, non-disclosure, and non-disparagement obligations. Korn reaffirmed those commitments when, following his termination from CVS in February 2023, he was offered and signed a severance agreement.

Given those contractual commitments, CVS was alarmed to learn that Korn has been engaged to testify as an expert witness for the Chickasaw Nation *in the very dispute he worked on while employed at CVS.* CVS was even more startled to discover that the basis for Korn's purported expertise is the confidential information he learned while employed at CVS and contractually agreed not to disclose to third parties, let alone in a context that could cause loss to CVS. Moreover, CVS was informed that Korn voluntarily offered his services to the Chickasaw Nation in July 2023, a mere five months after his departure from CVS. In so doing, Korn blatantly disregarded his one-year commitment to not provide consulting services to third parties adverse to CVS.

Korn's effort to trade on the confidential information he learned while working at CVS—including with the Chickasaw Nation in a dispute with which he was actively involved when he worked at CVS—poses a direct and immediate threat of harm to CVS. By this lawsuit, CVS

-2-

therefore seeks to enforce the RCA to which Korn agreed in April 2019 and reaffirmed in his March 2023 severance agreement.

## PARTIES

1.      CVS is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island.  CVS is a subsidiary of CVS Health Corporation.

2.      On information and belief, Korn is an individual residing in Magnolia, Texas.  Until his termination, effective February 4, 2023, Korn was the Vice President, Client Service Operations within CVS Health's Caremark business unit.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity between Plaintiff and Defendant.

4.      This Court has personal jurisdiction over Korn because he agreed in his Severance Agreement that he "consents to the Rhode Island courts' personal jurisdiction over Employee and waives Employee's right to object to a Rhode Island court's jurisdiction."  Ex. B, ¶ 22.

5.      Venue in this District is proper because Korn agreed in the Severance Agreement that "[t]he exclusive venue for any legal action to enforce or alleging breach of this Agreement will be the federal and state courts within Rhode Island."  Ex. B, ¶ 22.

## FACTS

### Korn's Role at CVS And His Access to Confidential Business Information

6.      Korn joined CVS Health on May 8, 2017 as Vice President, Client Service Operations.

7.     The CVS Health enterprise is comprised of several multi-billion-dollar business units that employ thousands of employees, including a health care benefits business (known as "Aetna"), the well-known retail pharmacy business that operates thousands of stores, a health care delivery business, and CVS Caremark. Korn's role at CVS focused on Caremark.

8.     CVS Caremark is the PBM arm of CVS Health. CVS Caremark provides pharmacy benefit services to entities that offer prescription drug coverage to their members and operates mail order and other types of pharmacies.

9.     The Indian Health Service ("IHS") is a federal agency within the Department of Health and Human Services. Under federal law, the IHS, Indian tribes, and tribal organizations have the right to submit claims for reimbursement to Caremark for prescriptions dispensed by these organizations when a Caremark client provides benefit coverage for the prescriptions. In this situation, the IHS, Indian tribes, and tribal organizations are considered the payer of last resort. Other federal agencies, including the Department of Defense, the Veteran's Administration, and state Medicaid agencies have similar rights under other federal statutes to submit claims for reimbursement to Caremark.

10.     As Vice President, Client Service Operations, Korn was responsible for Medicaid and Government Agency claims processing services for Caremark. Specifically, Korn served as the leader of the department responsible for the processing of reimbursement claims by the above-referenced government-related entities. Among other responsibilities, Korn and the employees he supervised were responsible for managing and implementing the processes and procedures used by Caremark for adjudicating claims submitted to Caremark by these government-related entities on a day-to-day basis. As such, the processing of claims submitted for reimbursement by the IHS, Indian tribes, tribal organizations, and other government-related entities to Caremark fell under

-4-

Korn's and his department's purview. The law applicable to the adjudication and reimbursement of claims submitted by these government-related entities is highly complex and specialized. As a result, Korn was required to communicate frequently and regularly with both internal and external counsel in order to perform these responsibilities.

11. Korn's department was also responsible for all supporting functions related to processing claims from government-related entities, such as those required for audit, reporting, compliance, and oversight. To carry out that leadership role, Korn worked closely with other high-ranking individuals across CVS Health's business, including its Chief Compliance Officer, its Senior Vice President of Client Operations, Legal, Compliance, the Medicaid/Med D Business Team, Finance, and Account Management.

12. To perform his leadership duties—including with respect to claims submitted by ITU Pharmacies—Korn was entrusted with large amounts of closely-held confidential information.

13. For instance, Korn had access to the internal workings of Caremark's system for processing government-entity-related reimbursement claims. PBMs like Caremark contract with pharmacies to create networks in which those pharmacies provide services to customers, among other things. Those contracts spell out the terms by which the pharmacy will be reimbursed for the prescriptions that it provides. To ensure that those complex contractual terms are complied with, Caremark utilizes an electronic claim processing system that seeks to apply the terms of each contract to ensure that reimbursement is handled as agreed by the parties.

14. The electronic claims processing system that Caremark utilizes is highly confidential and proprietary to Caremark. It was developed and refined by Caremark over many years at great expense to Caremark. It is used to adjudicate claims submitted by entities like ITU

Pharmacies.  The details of how that processing system works, the ways in which CVS utilizes it, and any changes Caremark makes to the system are all closely held information known to insiders like Korn but closely guarded from disclosure to third parties.

15.    Korn also has extensive knowledge of CVS's confidential strategies with respect to both pharmacy and client pricing and contracting, including reimbursement rates, as well as confidential information relating to Caremark's client plan designs.  As noted, extensive and intricate contracts govern the terms of Caremark's provision of prescription management services to PBM clients and Caremark's reimbursement to network pharmacy providers.   The information in these contracts, and the strategies that CVS uses when negotiating them—including as to issues such as pricing, reimbursement rates, and the like—are highly confidential and proprietary to Caremark.  In addition, information relating to Caremark's clients' benefit plan designs is highly confidential.  Korn is intimately familiar with all of this confidential business information because such knowledge was necessary for him to perform his responsibilities.

### Korn's Involvement in the Chickasaw Litigation

16.    When Korn joined CVS in 2017, CVS and its Legal Department were engaged in an ongoing dialogue with IHS regarding the application of certain rejection codes to reimbursement claims submitted by the IHS, Indian tribes, or tribal organizations to Caremark.

17.    Given Korn's responsibility for and expertise with Caremark's claim processing procedures, Korn quickly became a key player in those discussions.  Between 2017 and 2020, Korn worked frequently with CVS's in-house and outside counsel to address factual questions, investigate issues raised by IHS, and develop defenses to potential IHS litigation positions.  Those communications were and remain protected by the attorney-client privilege.

18.     On December 29, 2020, one Indian tribe, the Chickasaw Nation, filed suit against Caremark, other CVS affiliates, and non-CVS entities in the United States District Court for the Eastern District of Oklahoma (hereafter, the "Chickasaw Litigation").  That case was captioned *Chickasaw Nation v. CVS Caremark, LLC et al.*, Case No. 6:20-cv-00488 (E.D. Ok.) and has since been moved to arbitration.  That arbitration continues to this day, with the merits hearing scheduled to commence in early November 2024.

19.     The Chickasaw Nation alleges, among other claims, that Caremark and other defendants violated the Indian Health Care Improvement Act (25 U.S.C. § 1621e, known as the "Recovery Act") by improperly denying reimbursement claims submitted by ITU Pharmacies operated by the Chickasaw Nation.  That claim is predicated in part on the very same issues that Caremark had been discussing with IHS—that is, the alleged application of certain rejection codes to claims submitted by ITU Pharmacies to Caremark for reimbursement.

20.     Given the Chickasaw Litigation's focus on Caremark's processing of claims submitted by ITU Pharmacies, Korn was the primary resource for the CVS Caremark legal team to tap for internal information about the Caremark business.  Korn accepted that role enthusiastically and quickly became a core member of Caremark's defense team.

21.     To say that Korn was essential to developing CVS's confidential, privileged, and work-product-protected litigation strategy would be an understatement.  Shortly after the lawsuit was filed, CVS's counsel requested that Korn review the complaint to assess the allegations made therein.  In response to that request, Korn carefully analyzed key paragraphs in the complaint, and identified Caremark's potential factual defenses thereto.  Likewise, at counsel's request, Korn compiled detailed analyses of the Chickasaw Nation's factual allegations, including with respect to specific claims identified in the complaint, and gathered other factual information at the

direction of counsel relevant to the Chickasaw Litigation. And Korn otherwise was a frequent participant in litigation team calls and recipient of privileged emails from internal and external litigation counsel.

22. Korn remained actively involved in the Chickasaw Litigation until his termination from CVS, effective February 4, 2023.

23. Simply put, from the time he started working at CVS in May 2017 until his termination effective February 4, 2023, no other non-legal CVS employee played a bigger role than Korn in formulating Caremark's defense in the Chickasaw Litigation. And no other non-legal CVS employee was exposed to as much confidential, attorney-client privileged and attorney work product information regarding the Chickasaw Litigation as Korn was during that timeframe.

### Korn's Attempts To Trade On CVS's Confidential Information

24. Given Korn's expansive level of access to CVS's privileged and confidential information, it would be impossible for Korn to talk to a third party about the issues in the Chickasaw Litigation and *not* reveal CVS's privileged information. But that is precisely what Korn has been and intends to continue doing.

25. On August 2, 2024, the Chickasaw Nation disclosed to Caremark the expert witnesses it intends to rely upon at the upcoming merits arbitration hearing in the Chickasaw Litigation. Among those experts is Adam Korn.

26. On that same date, the Chickasaw Nation provided to Caremark a purported expert report authored by Korn. The Chickasaw Nation designated the contents of that report as "Confidential" under the Protective Order governing the Chickasaw Litigation, thus limiting CVS's ability to disclose its contents outside the arbitration. But at a high level, CVS understands that Korn purports to be an "expert" in Caremark's claims processing practices and procedures

based upon his former employment at CVS. CVS further understands that Korn's report discloses numerous pieces of CVS's confidential information, including information relating to CVS's internal processes and procedures for adjudicating and reimbursing ITU Pharmacy and other government-entity claims; CVS's contracting, pricing, and business strategies for its PBM contracts and its contracts with the pharmacies in the CVS pharmacy networks; and CVS's use of its claims adjudication pricing logic and software central to Caremark's Medicaid and Government Agency claim reimbursement process. And because Korn's report was prepared in conjunction with the Chickasaw Nation's lawyers, on information and belief, Korn disclosed to third parties additional CVS confidential information (including privileged information) beyond what is included in his report.

27.    It was Korn that approached the Chickasaw Nation about providing these purported expert services, not the other way around. Korn made that approach more than one year earlier, in July 2023—only three months after the effective date of his termination from CVS.

28.    On information and belief, Korn has also disclosed CVS confidential information (including privileged information) to other actual and potential CVS litigation adversaries, including other Indian tribes raising or threatening to raise claims similar to those at issue in the Chickasaw Litigation. In addition to the Chickasaw Litigation, Caremark is currently litigating similar disputes with three other Indian tribes. Those tribes are represented by the same lawyers as the Chickasaw Nation and are raising arguments identical to those raised by the Chickasaw Nation. Just as the confidential information disclosed by Korn to the Chickasaw Nation underlies the Nation's arguments in that dispute, on information and belief, Korn's disclosures of confidential information to other CVS litigation adversaries undergirds those entities' complaints and arguments as well.

29.     Simply put, Korn is attempting to leverage CVS's confidential information for his own pecuniary benefit by offering to disclose that information to CVS's litigation adversaries as a purported "expert."  And Korn is doing so in at least one dispute—the Chickasaw Litigation—that he actively worked on at CVS and in which he played a critical part in developing CVS's defense. Those are textbook violations of the restrictive covenant agreements that Korn signed while employed at CVS, as CVS next explains.

### Korn's Restrictive Covenant Agreement And Severance Agreement

30.     In 2019, Korn received an equity award from CVS that was contingent on his acceptance of various restrictive covenant obligations.  Korn signed the RCA on or about April 4, 2019.  A copy of that executed RCA is attached hereto as Exhibit A.

31.     Section 2 of the RCA provides that during Korn's employment at CVS and for 12 months following the termination of his employment, Korn will not "directly or indirectly[] engage in Competition or provide Consulting or Audit Services within the Restricted Area."  Ex. A § 2.  "Restricted Area" is defined to mean "those states within the United States in which the Corporation conducts its business, as well as the District of Columbia and Puerto Rico."  Ex. A § 2(e).

32.     The RCA defines "Consulting or Audit Services" as "any activity which involves providing audit review or other consulting or advisory services with respect to any relationship or prospective relationship between the Corporation and any third party that is likely to result in the use or disclosure of Confidential Information."  Ex. A § 2(c).

33.     Korn agreed to abide by the non-competition and non-consultation obligations imposed by Section 2 for a "period of 12 months following the termination of my employment with the Corporation for any reason."  Ex. A. § 2(d).

34.     Section 4 of the RCA provides that Korn "will not at any time, whether during or after the termination of my employment, disclose to any person or entity any of the Corporation's Confidential Information, except as may be appropriately required in the ordinary course of performing my duties as an employee of the Corporation." Ex. A § 4(a). Section 4 of the RCA further provides that Korn "shall not use or attempt to use any Confidential Information on behalf of any person or entity other than the Corporation, or in any manner which may injure or cause loss or may be calculated to injure or cause loss, whether directly or indirectly, to the Corporation." Ex. A § 4(a).

35.     The RCA defines "Confidential Information" broadly to encompass a wide variety of "non-public information" including but not limited to "strategic compilations and analysis," "business or financial methods, practices and plans," "pharmacy reimbursement rates," "premium information," and "payment rates." Ex. A § 4(a). That broad definition also encompasses attorney-client or other privileged and protected communications to which Korn was privy to during his employment at CVS.

36.     Pursuant to Section 9 of the RCA, Korn agreed that "[a]ny breach of this Agreement by me will cause irreparable damage to the Corporation and, in the event of such breach, the Corporation shall have, in addition to any and all remedies of law, the right to an injunction, specific performance, or other equitable relief to prevent the violation of my obligations hereunder." Ex. A § 9.

37.     The RCA is "governed by and construed in accordance with the laws of the state of Rhode Island."

38.     Korn agreed to continue to be bound by the terms of the RCA in the Severance Agreement he was offered and agreed to in March 2024.

-11-

39.     In or around early 2023, CVS notified Korn that he was being terminated as part of a company-wide layoff.

40.     The effective date of Korn's termination was February 4, 2023.

41.     On March 24, 2023, Korn entered into the Severance Agreement and General Release with CVS (the "Severance Agreement"). A true and accurate copy of the Severance Agreement is attached as Exhibit B.

42.     The Severance Agreement establishes a one-year "Severance Pay Period" running from Korn's last day of employment on February 4, 2023 through February 3, 2024.  Ex. B § 2.

43.     In exchange for and contingent on certain obligations that Korn would have to the Company, CVS agreed to provide 52 weeks of severance payment based on Korn's base salary, totaling approximately $250,000, as well as other benefits including outplacement assistance and subsidized COBRA benefits (together, the "Severance Pay").

44.     Section 2 of the Severance Agreement provides that this Severance Pay was contingent on Korn's "compliance with the obligations set forth in this Agreement."  Ex. B § 2.

45.     Section 15(a) of the Severance Agreements obligated Korn to "not make any statements that disparage the business or reputation of the Company, and/or any officer, director or employee of the Company."  Ex. B § 15(a).

46.     Section 15(d) of the Severance Agreement further obligated Korn to abide by the terms of his pre-existing RCA as a condition of eligibility for his Severance Payment.  It provides: "If you have previously entered into a restrictive covenant agreement ("RCA") with the Company, you acknowledge that you continue to be legally bound by the obligations set forth in the RCA prior to and following your Employment Termination Date."  Ex. B § 15(d).

47. Section 16 of the Severance Agreement reserves the right for CVS to pursue all legal remedies available to it for violations of the Agreement. It further provides for the recovery of its attorneys' fees if a court issues an order in its favor or awards it "any damages due to Employee's breach of [the Severance] Agreement." Ex. B § 16.

48. The Severance Agreement is "governed by and conformed in accordance with the laws of the state of Rhode Island without regard to its conflict of laws provision." Ex. B § 22.

## COUNT I – BREACH OF CONTRACT

49. CVS repeats and re-alleges the allegations contained in paragraphs 1–48 above.

50. Korn's RCA is a binding and enforceable agreement between Korn and CVS.

51. Korn's Severance Agreement is also a binding and enforceable agreement between Korn and CVS.

52. The non-disclosure obligations within Section 4 of the RCA and incorporated by the Severance Agreement are reasonable scope and serve the legitimate business purpose of protecting CVS's confidential information and goodwill.

53. Korn has breached, or has threatened to breach, his non-disclosure obligations by disclosing confidential information (including privileged information) to the Chickasaw Nation and its counsel, as well as other actual or potential litigation adversaries of CVS.

54. The covenant not to compete within Section 2 of the RCA and incorporated by the Severance Agreement is reasonable in time and scope and serves the legitimate business purpose of protecting CVS's confidential information and/or goodwill.

55. Korn has breached, or has threatened to breach, his covenant not to compete by offering expert witness services to the Chickasaw Nation and potential or actual CVS litigation adversaries within 12 months of the termination of his employment at CVS.

56.     The non-disparagement obligations within the Severance Agreement are reasonable in scope, are supported by adequate consideration, and serve the legitimate business purposes of CVS.

57.     Korn has breached, or has threatened to breach, his non-disparagement obligations by offering to provide expert testimony on behalf of CVS's litigation adversaries, including the Chickasaw Nation as well as other actual or potential litigation adversaries of CVS.

58.     CVS has performed each and every obligation and condition required of it pursuant to the RCA and the Severance Agreement.

59.     CVS has been or will be harmed by Korn's breaches of contract and will continue to be harmed as long as Korn attempts to trade on the confidential information he obtained while employed at CVS.

### COUNT II – BREACH OF FIDUCIARY DUTY OF CONFIDENTIALITY AND LOYALTY

60.     CVS repeats and re-alleges the allegations contained in paragraphs 1–59 above.

61.     As an employee of CVS with access to confidential information (including privileged information), Korn occupied a position of confidence with CVS.  As such, Korn owed CVS a fiduciary duty of confidentiality and loyalty prohibiting the disclosure of that confidential information in a manner likely to injure CVS's business.

62.     Korn continued to owe CVS that fiduciary duty of confidentiality and loyalty following the termination of his employment.

63.     Korn breached or threatened to breach his fiduciary duty of confidentiality and loyalty to CVS when he traded or attempted to trade on the confidential information he obtained by CVS by offering expert witness services to the Chickasaw Nation and other CVS litigation adversaries.

64.    CVS has been or will be harmed by Korn's breaches of his fiduciary duty of confidentiality loyalty and will continue to be harmed as long as Korn attempts to trade on the confidential information he obtained while employed at CVS.

## **REQUEST FOR RELIEF**

Wherefore, Plaintiff CVS Pharmacy, Inc. respectfully requests that this Court grant the following relief:

A.    Enter judgment for Plaintiff against Defendant on all counts of this Complaint;

B.    Award Plaintiff damages in an amount to be determined at trial;

C.    Issue preliminary and permanent injunctive relief to restrain and enjoin Defendant Korn from disclosing or using CVS's confidential information (including privileged information) for any purpose;

D.    Award Plaintiff attorneys' fees, costs, and expenses in this action; and

E.    Grant any such other relief that the Court deems just and proper.

Dated:  August 22, 2024

Respectfully Submitted,

CVS PHARMACY, INC.

By its attorneys,

/s/ Rebecca F. Briggs

Rebecca F. Briggs
R.I. Bar No. 8114
HINCKLEY ALLEN & SNYDER
LLP
100 Westminster Street
Suite 1500
Providence RI 02903-2319
Tel.: 401-274-2000
Fax: 401-277-9600
rbriggs@hinckleyallen.com

Michael L. Rosen, BBO #559954
(admission *pro hac vice* to be sought)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel.:   617-832-1000
Fax:    617-832-7000
mrosen@foleyhoag.com

James M. Gross
(admission *pro hac vice* to be sought)
FOLEY HOAG
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
Tel:     212-812-0400
Fax:     212-812-0399
jgross@foleyhoag.com

*Attorneys for Plaintiff CVS Pharmacy, Inc.*